**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

IN RE:

**RIC F. MALIK**

Debtor

Case No. 23-03241-ESL7

Chapter 7

*RECEIVED AND FILED*
*PRO SE UPLOAD TOOL*
*04/09/2025 - 05:49 PM*
*USBC*
*(WRT)*

### DEBTOR'S RESPONSE TO CREDITORS' MOTION TO DISMISS AND OPPOSITION TO SANCTIONS

TO THE HONORABLE JUDGE ENRIQUE S. LAMOUTTE,

COMES NOW, Debtor, RIC F. MALIK, PRO SE, and respectfully states as follows:

1. I acknowledge the concerns raised by creditors Earl and Tama Geertgens and submit this response in good faith. However, I firmly deny any intent to mislead, conceal, or obstruct this Court's process. I have cooperated in good faith throughout, as a self-represented debtor unfamiliar with the technicalities of legal procedure.

2. I respectfully deny all allegations of concealment or bad faith. I have submitted discovery to the best of my ability under duress, including documents requested by creditors. Any omission or delay is not intentional, and I remain willing to supplement with clarification. The creditors' counsel mischaracterizes confusion, trauma, and complexity as misconduct. I have endured months of emotional and psychological stress caused by the relentless pressure and legal aggression from the creditors and their attorney. **A sworn affidavit outlining my personal account and the impact of this harassment is attached hereto as Exhibit A.**

3. *Ford Truck Transaction*: The 2015 Ford F250 was owned by a business entity and was sold more than six months prior to the bankruptcy petition. My son had been making payments toward the truck, and I received a portion of the sale proceeds in cash. At the time, I did not maintain a bank account due to ongoing legal threats and the risk of creditor levy. These funds were used for basic living expenses, and the transaction was disclosed in my discovery. No concealment was intended, and I am prepared to provide additional clarification if needed. This was a routine business matter, and any ambiguity stems from my lack of legal counsel at the time—not dishonesty.

4. *Moorestown Construction & MC Remodeling*: Moorestown Construction, LLC ceased operations before I filed for bankruptcy and had no assets. I no longer had any interest in it. Its omission was neither material nor deceptive. MC Remodeling, LLC, is my son's company which he started in 2012 after college, and continues to

operate. MC Remodeling, LLC, is solely owned and operated by my son and has never been part of my estate. I was never a member or equity holder in MC Remodeling. Despite this, the creditors' attorney has repeatedly and improperly targeted my son's business in violation of the automatic stay, causing irreparable harm to him and his livelihood. **His sworn affidavit describing these violations and their effect is attached as Exhibit C, H, I, and J.**

5. I had no personal bank accounts for nearly a decade and only opened one after relocating to Puerto Rico. If more records are needed, I will work with the Trustee to supply them. I am not withholding information. If needed, I will submit a notarized declaration attesting to the absence of records and assist the Trustee in alternative verification.

6. *Puerto Rico Residency and Venue*: My relocation to Puerto Rico was in good faith. I leased a home in Vieques in June 2023, have my license and vehicles registered here, receive all mail and have started a construction company here. I have no intention of returning to New Jersey. My move was not for venue manipulation. Venue is proper under 28 U.S.C. § 1408.

7. *Medical Crisis and Emotional Impact*: The reference to a New Jersey contempt warrant is both misleading and prejudicial. I terminated my attorney, Mark Molz, before relocating, and I was never served. The claim that I was served is false. My wife, who was not a party to the case, returned all such mail. I was made aware that there was an arrest warrant for me in New Jersey approximately a year and a half after it was issued. I was never personally served by any court or officer. Once I became aware of it, I truly had no reason to return to the chaos and hostility I had experienced there. The Geertgens' attorney, Karen Murray, has continually pursued this case outside the bounds of law. After Thanksgiving 2023, my wife suffered a severe nervous breakdown, was found unconscious, and spent nearly a month in intensive care. She continues to suffer from long-term effects. My son has also been harassed—his bank accounts levied, his clients threatened—causing immense financial and emotional strain. The creditor's actions have affected not only me, but my entire family. This is not merely litigation; it is personal and retaliatory abuse. **The affidavit of Karen Malik detailing these events and their lasting impact is attached as Exhibit B and K.**

8. *Automatic Stay Violations*: Karen Murray has continually violated the automatic stay under 11 U.S.C. § 362. She has pursued litigation post-petition, targeted my son's business, levied accounts, and harassed clients. After Thanksgiving 2023, my wife suffered a nervous breakdown due to the legal pressure and was hospitalized. My son has also suffered financially and emotionally. I respectfully request the Court issue an order to show cause and consider sanctions pursuant to 11 U.S.C. § 362(k) for willful stay violations. **See also Exhibits B, C.**

9. *Loan from Jack Malik*: Regarding the Jack Malik loan: there is no intent to mislead. The original loan was $100,000 and was increased to $150,000 over time with

additional advances. Supporting records are not available. The inconsistency in statements reflects record keeping challenges, not fraud. I am willing to testify under oath and provide additional declarations if necessary.

10. *Denial of Fraud Allegations*: I deny that I have made false oaths or perjured myself. Any deficiencies are a product of misunderstanding or access limitations, not willful intent. Rule 1001 of the Federal Rules of Bankruptcy Procedure requires that the rules be construed to secure the just, speedy, and inexpensive determination of every case. Dismissal would be a disproportionate and unjust remedy.

11. *Closing Statement*: "The Bankruptcy Code is designed to protect the honest but unfortunate debtor." — *Grogan v. Garner*, 498 U.S. 279 (1991). I believe I am exactly the type of individual this protection was intended for. I did not seek bankruptcy lightly. I did so because I had no other means of protecting myself or my family from ongoing harassment.

**WHEREFORE, I respectfully request this Honorable JUDGE ENRIQUE S. LAMOUTTE:**

- DENY the creditors' motion to dismiss;
- Permit me to proceed with my case in good faith;
- Consider issuing sanctions against the creditors for willful violation of the automatic stay;
- Schedule a discovery conference to resolve any remaining disputes without prejudice.

**Exhibits:**

- **Exhibit A** – Affidavit of Ric F. Malik
- **Exhibit B** – Affidavit of Karen Malik
- **Exhibit C** – Affidavit of Andrew Mali
- **Exhibit D** – NOAA Lightning Strike July 2, 2014
- **Exhibit E** – Geertgen Paying Fire Dept.
- **Exhibit F** – Judges Findings
- **Exhibit G** – Notice to Consumer
- **Exhibit H** – Moorestown Construction LL Dissolution
- **Exhibit I** – TD Bank Account
- **Exhibit J** – MC Remodeling Formation

- **Exhibit K –** Ric Malik Arrest Warrant

---

Respectfully submitted,

**RIC F. MALIK, PRO SE**
P.O. Box 756
Vieques, PR 00765
Email: ricmalik3@gmail.com
Phone: 787-530-7799
**Date: April 6, 2025**

---

*Exhibit A*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF PUERTO RICO

# In re:
# Ric F. Malik, Debtor
# Chapter 7
# Case No: 23-03241-ESL7

## DECLARATION OF RIC F. MALIK REGARDING WORK PERFORMED FOR THE GEERTGENS AND SUBSEQUENT LEGAL ISSUES

I, Ric F. Malik, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

### 1. Brief History and Background

Before graduating high school, I had already launched my own construction company. I discovered early on what I loved to do and have spent my career helping thousands of people through quality workmanship and honest business practices. After marrying my wife, we built a reputable construction firm in Moorestown, New Jersey.

When our children were school-aged, we began working at the private school they attended to receive a significant tuition discount. It was there that we met the Geertgens family. Their younger daughter often stayed at our home, as her parents were frequently busy with work and had limited time for her.

One evening, we received a call that their house had been struck by lightning and caught fire. We rushed over to offer support. Based on my construction experience, I gave Mr. Geertgens guidance on how to proceed with the insurance claim. He later chose not to follow that advice. Sometime afterward, he contacted me again, stating that his public adjuster had only secured $240,000—an amount he felt was insufficient to restore the home.

I agreed that the figure seemed low and offered to prepare a detailed construction cost estimate. He paid my company $25,000 for this report, which took approximately five months to complete.

## 2. The Construction Agreement

After reviewing the estimate, Mr. Geertgens informed me that the insurer had issued a full payout of $860,000. He then asked to expand the scope of the project to include upgrades and additions, bringing the total project value to approximately $1.1 million.

After a lengthy back-and-forth over the wording of the construction contract, I told them, "Make the changes you want, and I'll sign it." They returned a final version, I signed it, and shortly after, they gave me a check for $100,000—though they asked me to hold onto it for a few days before depositing.

It is worth noting that after a few weeks of negotiating the construction contract's wording, I handed it to the Geertgens and told them to make whatever changes they wanted—I would sign it. So, it was particularly ironic that I was later found liable for not preparing the contract with proper language.

Upon arrival at the job site, I found a group of laborers already present. Mr. Geertgens explained they were his company's workers and would follow my direction. When I asked for architectural plans to obtain the necessary permits, I learned the architect had not been paid and would not release them. This meant I could not obtain building, electrical, plumbing, or fire permits, all of which are legally required before any work could proceed.

Mr. Geertgens also introduced subcontractors, whom he had clearly pre-arranged. My agreement included allowances for their work and standard construction management fees.

## 3. Project Irregularities and Concerns

About a week into the job, I began to doubt the legitimacy of the alleged lightning damage. We could not find any damage from lightning in the roof, and when we cut the ceiling to inspect the joists and found only surface-level charring. I proposed sandblasting and sealing the beams, then hiring a licensed structural engineer to inspect and certify the structure. Mr. Geertgens agreed. The engineer deemed the home structurally sound, and my company issued a $100,000 credit for the repairs that no longer needed to be performed.

The understanding was that this credit would be returned to the insurance company. To my knowledge, this never happened.

Over six weeks of work—including a crew of four and multiple subcontractors—I submitted three invoices via standard AIA billing forms. Only the initial $110,000 payment had been made. After sending formal notice, I ceased work due to non-payment.

Meanwhile, job site interference by Mr. Geertgens became increasingly disruptive. Despite having no construction background, he micromanaged the project daily—even complaining that one of our room labels was attached with only a single piece of tape. **Exhibit D**

## 4. Serious Concerns and Legal Fallout

After we left the project, several facts came to light that raised serious concerns:

1. Mr. Geertgens appeared to hire us mainly to generate the documentation needed to support his collection of insurance claim;

2. The origin of the fire remained questionable, with no clear damage consistent with a lightning strike; **Exhibit E**

3. The $100,000 credit we issued was never returned to the insurer;

4. The Geertgens formed their own construction company—shortly after we stopped work to receiving the payout—to bill the insurance company directly;

5. During trial, they testified they could not afford to complete a full restoration, which included upgrades such as HVAC systems, new electrical wiring, complete plumbing replacement, full kitchen and bathroom renovations, and total interior/exterior repainting—none of which were transparently disclosed to their insurance company;

6. No permits were ever obtained for this extensive work;

7. NOAA has no recorded lightning strike at the house during that time frame; (See Exhibit A)

8. A tree was arbitrarily cut down prior to construction work beginning;

9. Shortly thereafter, the Geertgens purchased a new office building, raising questions about the use of insurance funds;

10. Mr. Geertgens filed for bankruptcy in the 1990s after overleveraging multiple rental properties;

11. Approximately two months after the fire—but nearly ten months before receiving the insurance proceeds—the Geertgens issued $500 checks to each of the seven local volunteer fire companies that responded. This early donation, despite the absence of funds from their insurer, suggests a strategic attempt to gain goodwill or influence public perception before any investigation into the fire's legitimacy could occur;

12. Mr. Geertgens also stated that both his father and grandfather were firefighters. Combined with the early donations to local fire companies, this raises concerns that the family's fire service background may have been used to build credibility or reduce scrutiny during and after the fire. Additionally, the fire occurred on July 2, 2014—a time when all local volunteer departments were available and responded promptly—yet the damage claimed and ultimately reimbursed was extensive, despite minimal physical evidence of such destruction.

13. A photograph taken on September 24, 2014, titled "Geertgen house 9-24-2014.png," shows that visible damage was limited exclusively to the top right portion of the third floor. There is no apparent charring, blackening, or roof damage consistent with a lightning strike. This visual documentation contradicts the narrative that the fire was caused by lightning and supports the assertion that the true source or extent of the damage may have been misrepresented. **(See Exhibit B)**

## 5. Legal Outcome

The Geertgens ultimately sued me under the New Jersey Consumer Fraud Act, alleging I failed to provide a three-day right-to-cancel notice. The judge agreed I had not complied with that technical requirement but made no finding of fraud or wrongdoing in my work. However, I was ordered to return the $110,000 payment and cover their attorney fees. **Exhibit F and G**

It's important to note that under New Jersey law, insurance fraud carries a five-year statute of limitations. The Geertgens did not aggressively pursue this judgment until after that period had expired —despite having access to all relevant documentation and financial records for years.

## 6. Conclusion

Based on my direct experience, court testimony, and subsequent discoveries, this situation raises multiple red flags consistent with insurance fraud—including possible misrepresentation of damages, failure to return credited funds, undisclosed upgrades, lack of permitting, and questionable use of insurance money.

I submit this declaration in good faith for legal, ethical, and financial review.

**Executed on this  6th day of April, 2025.**

**Signature:**
**Ric F. Malik**
756 Vieques, PR 00765
Email: ricmalik3@gmail.com
Phone: 787-530-7799

*Exhibit A*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF PUERTO RICO


**In re:**
**Ric F. Malik, Debtor**
**Chapter 7**
**Case No: 23-03241-ESL7**


## DECLARATION OF RIC F. MALIK REGARDING WORK PERFORMED FOR THE GEERTGENS AND SUBSEQUENT LEGAL ISSUES

I, Ric F. Malik, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

### 1. Brief History and Background

Before graduating high school, I had already launched my own construction company. I discovered early on what I loved to do and have spent my career helping thousands of people through quality workmanship and honest business practices. After marrying my wife, we built a reputable construction firm in Moorestown, New Jersey.

When our children were school-aged, we began working at the private school they attended to receive a significant tuition discount. It was there that we met the Geertgens family. Their younger daughter often stayed at our home, as her parents were frequently busy with work and had limited time for her.

One evening, we received a call that their house had been struck by lightning and caught fire. We rushed over to offer support. Based on my construction experience, I gave Mr. Geertgens guidance on how to proceed with the insurance claim. He later chose not to follow that advice. Sometime afterward, he contacted me again, stating that his public adjuster had only secured $240,000—an amount he felt was insufficient to restore the home.

I agreed that the figure seemed low and offered to prepare a detailed construction cost estimate. He paid my company $25,000 for this report, which took approximately five months to complete.

### 2. The Construction Agreement

After reviewing the estimate, Mr. Geertgens informed me that the insurer had issued a full payout of $860,000. He then asked to expand the scope of the project to include upgrades and additions, bringing the total project value to approximately $1.1 million.

After a lengthy back-and-forth over the wording of the construction contract, I told them, "Make the changes you want, and I'll sign it." They returned a final version, I signed it, and shortly after, they gave me a check for $100,000—though they asked me to hold onto it for a few days before depositing.

Upon arrival at the job site, I found a group of laborers already present. Mr. Geertgens explained they were his company's workers and would follow my direction. When I asked for architectural plans to obtain the necessary permits, I learned the architect had not been paid and would not release them. This meant I could not obtain building, electrical, plumbing, or fire permits, all of which are legally required before any work could proceed.

Mr. Geertgens also introduced subcontractors, whom he had clearly pre-arranged. My agreement included allowances for their work and standard construction management fees.

## 3. Project Irregularities and Concerns

About a week into the job, I began to doubt the legitimacy of the alleged lightning damage. We could not find any damage from lightning in the roof, and when we cut the ceiling to inspect the joists and found only surface-level charring. I proposed sandblasting and sealing the beams, then hiring a licensed structural engineer to inspect and certify the structure. Mr. Geertgens agreed. The engineer deemed the home structurally sound, and my company issued a $100,000 credit for the repairs that no longer needed to be performed.

The understanding was that this credit would be returned to the insurance company. To my knowledge, this never happened.

Over six weeks of work—including a crew of four and multiple subcontractors—I submitted three invoices via standard AIA billing forms. Only the initial $110,000 payment had been made. After sending formal notice, I ceased work due to non-payment.

Meanwhile, job site interference by Mr. Geertgens became increasingly disruptive. Despite having no construction background, he micromanaged the project daily—even complaining that one of our room labels was attached with only a single piece of tape.

## 4. Serious Concerns and Legal Fallout

After we left the project, several facts came to light that raised serious concerns:

1. Mr. Geertgens appeared to hire us mainly to generate the documentation needed to support his collection of insurance claim;

2. The origin of the fire remained questionable, with no clear damage consistent with a lightning strike;

3. The $100,000 credit we issued was never returned to the insurer;

4. The Geertgens formed their own construction company—shortly after we stopped work to receiving the payout—to bill the insurance company directly;

5. During trial, they testified they could not afford to complete a full restoration, which included upgrades such as HVAC systems, new electrical wiring, complete plumbing replacement, full kitchen and bathroom renovations, and total interior/exterior repainting—none of which were transparently disclosed to their insurance company;

6. No permits were ever obtained for this extensive work;

7. NOAA has no recorded lightning strike at the house during that time frame; (See Exhibit A)

8. A tree was arbitrarily cut down prior to construction work beginning;

9. Shortly thereafter, the Geertgens purchased a new office building, raising questions about the use of insurance funds;

10. Mr. Geertgens filed for bankruptcy in the 1990s after overleveraging multiple rental properties;

11. Approximately two months after the fire—but nearly ten months before receiving the insurance proceeds—the Geertgens issued $500 checks to each of the seven local volunteer fire companies that responded. This early donation, despite the absence of funds from their insurer, suggests a strategic attempt to gain goodwill or influence public perception before any investigation into the fire's legitimacy could occur;

12. Mr. Geertgens also stated that both his father and grandfather were firefighters. Combined with the early donations to local fire companies, this raises concerns that the family's fire service background may have been used to build credibility or reduce scrutiny during and after the fire. Additionally, the fire occurred on July 2, 2014—a time when all local volunteer departments were available and responded promptly—yet the damage claimed and ultimately reimbursed was extensive, despite minimal physical evidence of such destruction.

13. A photograph taken on September 24, 2014, titled "Geertgen house 9-24-2014.png," shows that visible damage was limited exclusively to the top right portion of the third floor. There is no apparent charring, blackening, or roof damage consistent with a lightning strike. This visual documentation contradicts the narrative that the fire was caused by lightning and supports the assertion that the true source or extent of the damage may have been misrepresented. **(See Exhibit B)**

## 5. Legal Outcome

The Geertgens ultimately sued me under the New Jersey Consumer Fraud Act, alleging I failed to provide a three-day right-to-cancel notice. The judge agreed I had not complied with that technical requirement but made no finding of fraud or wrongdoing in my work. However, I was ordered to return the $110,000 payment and cover their attorney fees.

It's important to note that under New Jersey law, insurance fraud carries a five-year statute of limitations. The Geertgens did not aggressively pursue this judgment until after that period had expired—despite having access to all relevant documentation and financial records for years.

## 6. Conclusion

Based on my direct experience, court testimony, and subsequent discoveries, this situation raises multiple red flags consistent with insurance fraud—including possible misrepresentation of damages, failure to return credited funds, undisclosed upgrades, lack of permitting, and questionable use of insurance money.

I submit this declaration in good faith for legal, ethical, and financial review.

**Executed on this  6th day of April, 2025.**

**Signature:**
**Ric F. Malik**
756 Vieques, PR 00765
Email: ricmalik3@gmail.com
Phone: 787-530-7799

*Exhibit B*

## AFFIDAVIT OF KAREN MALIK
State of New Jersey
County of Burlington

I, Karen Malik, being duly sworn, declare under penalty of perjury the following:

**1. Introduction and Background**
 - My name is Karen Malik.
 - I am the wife of Ric F. Malik (the Debtor), who filed for Chapter 7 bankruptcy (Case No. 23-03241-ESL7) on October 6, 2023, in the U.S. Bankruptcy Court for the District of Puerto Rico.
 - Although I am not a party to the bankruptcy case, I have been directly affected by actions taken by the creditors and their attorney.

**2. Notice of Bankruptcy and the Automatic Stay**
 - I am aware that Earl and Tama Geertgens are listed creditors in this case.
 - To my knowledge, they and their attorney, Karen Murray, were served notice of the bankruptcy filing and the automatic stay via certified mail and/or electronic means by October 12, 2023.

**3. Violations of the Automatic Stay by Creditors and Counsel**
 - Despite receiving notice of the bankruptcy and the protections afforded under 11 U.S.C. § 362, the creditors, through their counsel Karen Murray, have continued to engage in collection activity.
 - These actions include:
  • Continuing litigation in the Superior Court of New Jersey, Burlington County, under Case No. BUR-L-1741-23.
  • Filing claims and subpoenas involving my son, Andrew Malik, and his business, MC Remodeling LLC.
  • Freezing bank accounts, contacting clients of MC Remodeling LLC, and issuing legal threats—all after the automatic stay took effect.
  • Personally targeting me with legal notices, despite my not being a party to the bankruptcy.

**4. Emotional and Physical Impact**
 - These actions have placed extreme emotional stress on my family and me.
 - In the days following Thanksgiving 2023, I suffered a severe mental health episode and was found unconscious in my home. I was hospitalized in the intensive care unit for nearly a month and continue to suffer physical and mental health challenges as a result.
 - The anxiety, harassment, and fear created by these legal actions have severely damaged my quality of life both personally and in my work.

**5. Financial Impact and Household Disruption**
 - Our family's finances have been directly harmed by the Geertgens' continued pursuit of legal action, particularly through the freezing of assets and interference with Andrew's income.
 - I am currently unable to work due to my health, and these actions have limited our access to necessary funds for basic needs.

**6. Conclusion**
 - I respectfully submit this affidavit to support Ric F. Malik's defense against the Motion to Dismiss and to document serious violations of the automatic stay.
 - The conduct of Karen Murray and the creditors has caused my family irreparable harm and disregards the protections provided under federal bankruptcy law.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 4-6-25

Signature: _____

*Karen Malik*
327 Delaware Ave.
Delanco, NJ 08075

Exhibit
C

### AFFIDAVIT OF ANDREW MALIK
State of New Jersey
County of Burlington

I, Andrew R. Malik, being duly sworn, declare under penalty of perjury as follows:

### 1. Introduction and Background
  - My name is Andrew  Malik.
  - I am the son of Ric Malik (Debtor), who filed for Chapter 7 bankruptcy (Case No. 23-03241-ESL7) on October 6, 2023.
  - I am not the debtor in this case. I am the sole owner of MC Remodeling LLC, an independent business entity.
  - I am listed as a creditor in my father's bankruptcy case due to financial assistance I provided him prior to the petition.
  - I am aware that Earl and Tama Geertgens are listed creditors in this case and are represented by attorney Karen Murray.

### 2. Notice of Bankruptcy Filing and Stay
  - My father filed for bankruptcy on October 6, 2023, in the U.S. Bankruptcy Court for the District of Puerto Rico.
  - To my knowledge, notice of the bankruptcy and the automatic stay under 11 U.S.C. § 362 was sent to Earl and Tama Geertgens and their counsel, Karen Murray, by certified mail and/or electronic means no later than October 12, 2023.

### 3. Violations of the Automatic Stay
  - Despite receiving proper notice of the bankruptcy, the Geertgens, through Karen Murray, have willfully continued litigation and collection activities:
  • They continued to pursue Case No. BUR-L-1741-23 in the Superior Court of New Jersey, Burlington County, alleging fraudulent transfers involving me and MC Remodeling LLC.
  • On October 13, 2023, and continuing to this day, they have initiated or continued actions such as:
    - Serving subpoenas and legal notices to me and my clients
    - freeze business accounts
    - Issuing deposition requests targeting both personal and professional relationships

### 4. Impact on Business Operations
  - Their actions have caused direct and severe disruption to MC Remodeling LLC:
  • I have lost significant time and energy dealing with legal threats and responses, diverting attention from my business.
  • Ongoing litigation has tarnished my reputation among clients, leading to cancelled or delayed projects.
  • I estimate a loss of approximately $300,000 in gross revenue compared to the previous fiscal year.

### 5. Emotional and Psychological Harm
  - These actions have taken a heavy emotional toll:
  • I have suffered anxiety, sleeplessness, and emotional stress due to continued harassment despite no wrongdoing on my part.

• I feel the need to keep my home blinds drawn and live in a heightened state of concern for personal and family privacy.
• My mother and girlfriend have also suffered emotionally and financially due to the indirect effects of the ongoing litigation.

## 6. Legal and Financial Consequences

- I have been forced to retain legal counsel to defend against improper actions, incurring thousands of dollars in legal fees.
- My bank accounts were subject to seizure attempts, forcing me to limit my use of traditional banking systems.
- I now operate largely in cash, which limits my ability to take on larger or government-financed construction projects, stalling my professional growth.

## 7. Conclusion

- Based on the above facts, it is evident that the Geertgens and their attorney, Karen Murray, have willfully violated the automatic stay by pursuing post-petition legal actions against a non-debtor.
- These violations have had serious consequences on my livelihood, financial stability, and emotional health.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 4/4/25
Signature: _____
*Andrew R. Malik*
30 Foxglove Dr.
Delran, NJ 08075

MARYLOU LAYMAN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES JANUARY 5 2030

Ex Hibit D

140702_pts_raw_wind

Raw Wind/Gust and LSR for 140702 12Z to 11:59Z the next day

| Time | Speed(MPH) | Location | County | State | LAT | LON | Remarks |
|---|---|---|---|---|---|---|---|
| 1447 | UNK | NORTH TOWANDA | BRADFORD | PA | 41.78 | -76.45 | TREE DOWN ON VEHICLE (BGM) |
| 1630 | UNK | SOUTH WILLIAMSPORT | LYCOMING | PA | 41.23 | -77 | TREES AND WIRES DOWN (CTP) |
| 1647 | UNK | LIVINGSTON MANOR | SULLIVAN | NY | 41.9 | -74.83 | REPORTED TREE THROUGH HOUSE AND PENNY SIZE HAIL. (BGM) |
| 1648 | UNK | LIVINGSTON MANOR | SULLIVAN | NY | 41.9 | -74.83 | REPORTED TREE INTO HOUSE AND PENNY SIZE HAIL. (BGM) |
| 1650 | UNK | MUNCY | LYCOMING | PA | 41.2 | -76.79 | TREES AND WIRES DOWN (CTP) |
| 1657 | UNK | HUGHESVILLE | LYCOMING | PA | 41.24 | -76.73 | TREES AND WIRES DOWN (CTP) |
| 1715 | UNK | NISKAYUNA | SCHENECTADY | NY | 42.82 | -73.9 | SMALL TREES DOWN (ALY) |
| 1730 | UNK | HANNACROIX | GREENE | NY | 42.43 | -73.81 | MULTIPLE TREES DOWN (ALY) |
| 1730 | UNK | 3 N BENTON | COLUMBIA | NY | 41.04 | -73.39 | TREES DOWN ON CAMP LEVINE ROAD (CTP) |
| 1737 | UNK | NAPANOCH | ULSTER | NY | 41.75 | -74.37 | TREE AND WIRES DOWN (ALY) |
| 1737 | UNK | 1 S LEBANON | LEBANON | PA | 40.33 | -76.42 | TREES DOWN ON EVERGREEN ROAD (CTP) |
| 1738 | UNK | RAVENA | ALBANY | NY | 42.48 | -73.81 | NUMEROUS TREE LIMBS DOWN (ALY) |
| 1745 | UNK | KRUMVILLE | ULSTER | NY | 41.88 | -74.24 | WIRES DOWN (ALY) |
| 1749 | UNK | YOUNGSVILLE | SULLIVAN | NY | 41.81 | -74.89 | POWERLINES DOWN AND DIME TO QUARTER SIZE HAIL REPORTED. (BGM) |
| 1750 | UNK | 2 E CORNWALL | LEBANON | PA | 40.27 | -76.37 | TREE UPROOTED ALONG RTE 419 (CTP) |
| 1755 | UNK | EAST GREENBUSH | RENSSELAER | NY | 42.59 | -73.7 | MULTIPLE TREES DOWN BETWEEN RTS 9 AND 20. (ALY) |
| 1755 | UNK | KLEINFELTERSVILLE | LEBANON | PA | 40.31 | -76.37 | TREES DOWN BETWEEN CORNWALL AND KLEINFELTERSVILLE (CTP) |
| 1756 | UNK | EAST GREENBUSH | RENSSELAER | NY | 42.59 | -73.7 | TREES AND WIRES DOWN (ALY) |
| 1801 | UNK | ATWOOD | ULSTER | PA | 41.89 | -74.16 | TREE AND WIRES DOWN IN ROAD (ALY) |
| 1802 | UNK | 1 NW BRICKERVILLE | LANCASTER | PA | 40.24 | -76.3 | TREE DOWN ON CAR ALONG RTE 322 (CTP) |
| 1805 | UNK | 1 NNW DENAULT CORNERS | RENSSELAER | NY | 42.61 | -73.52 | 3 TREES DOWN (ALY) |
| 1807 | UNK | NEW PALTZ | ULSTER | NY | 41.75 | -74.08 | WIRES DOWN (ALY) |
| 1807 | UNK | SUMMIT | SCHOHARIE | NY | 42.58 | -74.59 | WIRES DOWN (ALY) |
| 1811 | UNK | EAST GREENBUSH | RENSSELAER | NY | 42.59 | -73.7 | COLUMBIA TURNPIKE AND SPRING HURST DR. NUMEROUS TREES DOWN AND WIRES DOWN (ALY) |
| 1812 | UNK | RICHMONDVILLE | SCHOHARIE | NY | 42.63 | -74.56 | NUMEROUS TREES AND WIRES DOWN (ALY) |
| 1818 | UNK | THURMAN | WARREN | NY | 43.53 | -73.92 | TREES AND WIRES DOWN (ALY) |
| 1824 | UNK | SUMMIT | SCHOHARIE | NY | 42.58 | -74.59 | TREE DOWN (ALY) |
| 1827 | UNK | 2 W MARTINSBURG | BERKELEY | WV | 39.46 | -78 | 7 BIG TREES DOWN ALONG SIERRA DRIVE. (LWX) |
| 1830 | UNK | CRARYVILLE | COLUMBIA | NY | 42.17 | -73.58 | 1 TREE DOWN (ALY) |
| 1830 | UNK | 2 E MARTINSBURG | BERKELEY | WV | 39.46 | -77.94 | 2 TREES DOWN. (LWX) |
| 1830 | UNK | 2 E MARTINSBURG | BERKELEY | WV | 39.46 | -77.94 | TREES UPROOTED. (LWX) |
| 1833 | | 74 SCHOHARIE | SCHOHARIE | NY | 42.67 | -74.31 | NWS TRAINED OBSERVER MEASURED 74.3 MPH WIND AT 233PM. ALSO 1 TREE DOWN. (ALY) |
| 1834 | UNK | SCHOHARIE | SCHOHARIE | NY | 42.67 | -74.31 | WIRES DOWN (ALY) |
| 1835 | UNK | KEARNEYSVILLE | JEFFERSON | WV | 39.39 | -77.89 | TREES AND WIRES DOWN. (LWX) |
| 1835 | UNK | SCHOHARIE | SCHOHARIE | NY | 42.67 | -74.31 | TREE DOWN (ALY) |
| 1837 | UNK | ANCRAM | COLUMBIA | NY | 42.05 | -73.64 | TREES DOWN (ALY) |
| 1838 | UNK | SHELBURNE FALLS | FRANKLIN | MA | 42.6 | -72.74 | TREE DOWN AND WIRES DOWN ON TAYLOR ROAD AND GUY MANOR ROAD (BOX) |
| 1840 | UNK | GERRARDSTOWN | BERKELEY | WV | 39.37 | -78.09 | TREE DOWN ON HOUSE WITH ENTRAPMENT ON RIDGE RD NEAR SHENANDOAH JUNCTION (LWX) |
| 1842 | UNK | 2 WSW SHEPHERDSTOWN | JEFFERSON | WV | 39.42 | -77.84 | SEVERAL TREES DOWN AND THE TOPS OF A COUPLE OF TREES WERE KNOCKED OFF ALONG SPRING WARBLER WAY IN THE MECKLENBERG HEIGHTS SUBDIVISION (LWX) |
| 1843 | UNK | 2 SW WINEBRENNERS CROSS | BERKELEY | WV | 39.4 | -77.92 | TREES DOWN ACROSS THE ROAD NEAR THE ROUTE 9 AND SHORT ROAD INTERCHANGE. (LWX) |
| 1845 | UNK | SHEPHERDSTOWN | JEFFERSON | WV | 39.43 | -77.8 | SEVERAL LARGE TREES SNAPPED. (LWX) |
| 1845 | UNK | SHEPHERDSTOWN | JEFFERSON | WV | 39.43 | -77.81 | TREE DOWN ON WIRES ON DUKE ST. (LWX) |
| 1845 | UNK | SHEPHERDSTOWN | JEFFERSON | WV | 39.43 | -77.81 | TREE UPROOTED NEAR ROUTE 45 IN SHEPHERDSTOWN. (LWX) |
| 1850 | UNK | COLUMBIA | COLUMBIA | NY | 42.32 | -73.67 | TREES AND WIRES DOWN (ALY) |
| 1850 | UNK | 3 WSW LITTLE | ROCKINGHAM | VA | 38.5 | -77.84 | CHICKEN HOUSE DESTROYED AND SHED PUSHED 3 FEET. (LWX) |
| 1852 | UNK | 1 ENE BAKERTON | WASHINGTON | MD | 39.37 | -77.74 | DOWNED TREES AND LARGE BRANCHES ON CANAL TOWPATH. (LWX) |
| 1900 | UNK | LITTLETON | GRAFTON | NH | 44.31 | -71.77 | TREE BLOCKING I-93 SOUTHBOUND (GYX) |

140702_rpts_raw_wind

| Time | Location | County | State | Lat | Lon | Description |
|---|---|---|---|---|---|---|
| 2038 UNK | 1 NW TINTOP HILL | ST. MARYS | MD | 38.34 | -76.63 | TREE DOWN AT THE INTERSECTION OF MACINTOSH ROAD AND BURNT MILL DRIVE. (LWX) |
| 2038 UNK | 2 NE CRESTHILL | FAUQUIER | VA | 38.78 | -77.99 | TREE DOWN NEAR INTERSECTION OF CREST HILL ROAD AND LEEDS MANOR ROAD. (LWX) |
| 2039 UNK | WINSTED | LITCHFIELD | CT | 41.93 | -73.07 | NUMEROUS TREES DOWN (ALY) |
| 2042 UNK | RUMFORD | OXFORD | ME | 44.55 | -70.55 | MANY TREES DOWN (GYX) |
| 2047 UNK | FRANKFORD TWP | SUSSEX | NJ | 41.15 | -74.72 | TREE FELL ONTO A HOUSE. (PHI) |
| 2048 UNK | DOVER-FOXCROFT | PISCATAQUIS | ME | 45.18 | -69.23 | PISCATAQUIS COUNTY SHERIFF REPORTED NUMEROUS TREES AND POWERLINES DOWN. (CAR) |
| 2048 UNK | MANHEIM | LANCASTER | PA | 40.16 | -76.4 | TREES DOWN (CTP) |
| 2050 UNK | GRENADA | GRENADA | MS | 33.78 | -89.81 | NUMEROUS TREES DOWN ACROSS THE COUNTY ESPECIALLY IN THE NORTHERN AND EASTERN PARTS. (JAN) |
| 2057 UNK | WSW WHITE SULPHUR SPRIN | GREENBRIER | WV | 37.8 | -80.3 | TREE DOWN ON SHAMMAH WAY DR. (RNK) |
| 2100 UNK | ALLAMUCHY TWP | WARREN | NJ | 40.92 | -74.84 | WIRES DOWN. (PHI) |
| 2100 UNK | CORNISH | YORK | ME | 43.8 | -70.8 | TREES DOWN... BLOCKING ROADS. (CAR) |
| 2100 UNK | INDEPENDENCE TWP | WARREN | NJ | 40.88 | -74.88 | WIRES DOWN. (PHI) |
| 2100 UNK | KEZAR FALLS | OXFORD | ME | 43.81 | -70.89 | TREES DOWN BLOCKING ROADS. (GYX) |
| 2105 UNK | 2 WNW SEBAGO LAKE STATE | CUMBERLAND | ME | 43.93 | -70.62 | TREES AND WIRES DOWN ON RTE 114 TO BURNELL ROAD...TIME ESTIMATED FROM RADAR (GYX) |
| 2111 UNK | STONY POINT | ROCKLAND | NY | 41.23 | -74 | LARGE BRANCH/LIMB DOWN ACROSS MAJOR DRIVE (OKX) |
| 2114 UNK | SEBEC | PISCATAQUIS | ME | 45.27 | -69.12 | TREES DOWN IN SEBEC (CAR) |
| 2114 UNK | 2 NW BURNS | SMITH | MS | 32.16 | -89.57 | TIN WAS TORN OFF A CHICKEN HOUSE, SEVERAL PINE TREES WERE SNAPPED AND UPROOTED AS WELL. DAMAGE OCCURRED JUST SE OF TRENTON ALONG HWY 481. (JAN) |
| 2117 UNK | GREENVILLE | PISCATAQUIS | ME | 45.46 | -69.59 | TREES DOWN IN GREENVILLE (CAR) |
| 2119 UNK | ABBOT | PISCATAQUIS | ME | 45.19 | -69.45 | TREES DOWN IN ABBOT (CAR) |
| 2120 UNK | 2 ENE ROSE HILL | JASPER | MS | 32.16 | -88.96 | TREES DOWN ON HIGHWAY 513 AND COUNTY ROAD 5133. (JAN) |
| 2122 UNK | WINNSBORO | FRANKLIN | LA | 32.16 | -91.72 | A COUPLE TREES DOWN IN TOWN. (JAN) |
| 2123 UNK | ENFIELD | HARTFORD | CT | 41.97 | -72.57 | TREE DOWN ON RTE 5 (BOX) |
| 2125 UNK | FRYE ISLAND | CUMBERLAND | ME | 43.84 | -70.53 | TREES ABOUT 8 INCHES IN DIAMETER FELL INTO A HOUSE ON PADDOCK CIRCLE AND ONE ON SUNSET ROAD (GYX) |
| 2125 UNK | SEBEC | PISCATAQUIS | ME | 45.27 | -69.12 | TREES DOWN IN SEBEC (CAR) |
| 2126 | 882 ENE PATUXENT RIVER NA | ST. MARYS | MD | 38.28 | -76.41 | (LWX) |
| 2130 UNK | FLEMINGTON | HUNTERDON | NJ | 40.51 | -74.86 | TREES DOWN IN FLEMINGTON (PHI) |
| 2130 UNK | FRENCHTOWN | HUNTERDON | NJ | 40.53 | -75.06 | TREES DOWN IN FRENCHTOWN (PHI) |
| 2130 UNK | RARITAN TWP | HUNTERDON | NJ | 40.52 | -74.88 | TREES DOWN IN RARITAN TWP (PHI) |
| 2130 UNK | 5 NNE ALEXANDRIA | RAPIDES | LA | 31.36 | -92.42 | PICTURE OF POWER POLES SNAPPED IN PINEVILLE. (LCH) |
| 2140 UNK | 3 N RALEIGH | SMITH | MS | 32.07 | -89.52 | TREES DOWN ON HWY 35 (JAN) |
| 2145 UNK | COVINGTON CITY | CITY OF COVINGTON | VA | 37.78 | -79.98 | TREE DOWN AT MILE MARKER 19 ON INTERSTATE 64 (RNK) |
| 2145 UNK | 6 N EUPORA | WEBSTER | MS | 33.63 | -89.28 | TREE BLOCKING SUTTON ROAD. TIME ESTIMATED VIA RADAR. (GYX) |
| 2152 UNK | LINNEUS | AROOSTOOK | ME | 46.04 | -67.96 | TREES DOWN ON BURTON ROAD... SUMMERVILLE ROAD... BEN HILL ROAD... DREWS MILL ROAD.. AND RT 1A. (CAR) |
| 2152 UNK | 3 W LINNEUS | AROOSTOOK | ME | 46.04 | -68.02 | TREES DOWN ON BURTON ROAD... SUMMERVILLE ROAD... BEN HILL ROAD... DREWS MILL ROAD... AND RT 1A. (CAR) |
| 2152 UNK | 3 W LINNEUS | AROOSTOOK | ME | 46.04 | -68.02 | TREES DOWN ON BURTON ROAD... SUMMERVILLE ROAD... BEN HILL ROAD... DREWS MILL ROAD... LIMMERICK RD AND RT 1A. (CAR) |
| 2155 UNK | HOUSTON | CHICKASAW | MS | 33.9 | -89 | NUMEROUS TREES DOWN... POWERLINES DOWN (MEG) |
| 2155 UNK | LONGDALE FURNACE | ALLEGHANY | VA | 37.83 | -79.72 | CABLE LINE DOWN ALONG INTERSTATE 64 AT MILE MARKER 35. (RNK) |
| 2155 UNK | 2 WNW SEBAGO LAKE STATE | CUMBERLAND | ME | 43.93 | -70.62 | TREES AND WIRES DOWN ON RTE 114 TO BURNELL ROAD (GYX) |
| 2200 UNK | CLIFTON FORGE CITY | ALLEGHANY | VA | 37.82 | -79.83 | THREE TREES DOWN WITHIN THE CITY...INCLUDING ONE ON A VEHICLE. (RNK) |
| 2200 UNK | 5 NE ISLAND FALLS | AROOSTOOK | ME | 46.06 | -68.2 | TREES DOWN BETWEEN ISLAND FALLS AND OAKFIELD. (CAR) |
| 2205 UNK | 1 NW WEAVERVILLE | BUNCOMBE | NC | 35.71 | -82.57 | SEVERAL LIMBS COVERING ROAD AND MARBLE-SIZED HAIL. (GSP) |
| 2205 UNK | 4 W LINNEUS | AROOSTOOK | ME | 46.04 | -68.04 | LARGE TREES DOWN ON SOUTH OAKFIELD ROAD BETWEEN ISLAND FALLS AND LINNEUS. TIME IS FROM RADAR. (CAR) |
| 2210 UNK | 3 NW LINNEUS | AROOSTOOK | ME | 46.07 | -68 | LARGE TREES DOWN ON DREWS MILL ROAD. (CAR) |

140702_rpts_raw_wind

| Code | Location | County | State | Lat | Lon | Remarks |
|---|---|---|---|---|---|---|
| 0 UNK | NORTHEAST PHILADELPHIA | PHILADELPHIA | PA | 40.09 | -75.02 | TREES AND WIRES DOWN AT SEVERAL LOCATIONS ACROSS NORTHEAST PHILADELPHIA. (PHI) |
| 5 UNK | 2 E STUART | PATRICK | VA | 36.63 | -80.25 | TWO TREES DOWN ALONG U.S. ROUTE 58 EAST OF STUART. (RNK) |
| 9 UNK | ENE WOODVILLE | SURRY | NC | 36.5 | -80.48 | TREE DOWN ON A POWER LINE NEAR THE INTERSECTION OF WOODVILLE ROAD AND WESTFIELD ROAD. (RNK) |
| 10 UNK | RANDOLPH | BIBB | AL | 32.9 | -86.91 | SEVERAL TREES WERE BLOWN DOWN IN RANDOLPH RESULTING IN POWER OUTAGES FOR THE SURROUNDING AREA FOR 8 HOURS. (BMX) |
| 10 UNK | 4 SW MOUNT HOLLY WFO | BURLINGTON | NJ | 39.97 | -74.87 | TREE DOWN ALONG I 295. TIME ESTIMATED FROM RADAR (PHI) |
| 15 UNK | LIVINGSTON | LIVINGSTON | LA | 30.5 | -90.75 | SEVERAL TREES AND LARGE TREE LIMBS BLOWN DOWN IN THE COMMUNITY OF LIVINGSTON. (LIX) |
| 17 UNK | 2 SE PINEY CREEK | ALLEGHANY | NC | 36.53 | -81.27 | TWO TREES DOWN IN THE PINEY CREEK AREA. (RNK) |
| 17 UNK | 6 WSW FRANCISCO | SURRY | NC | 36.47 | -80.46 | TREE DOWN ON A POWER LINE IN THE 1400 BLOCK ON TOMS CREEK CHURCH ROAD. (RNK) |
| 20 UNK | 2 NW CINNAMINSON | BURLINGTON | NJ | 40.02 | -75.02 | DAMAGE TO SAIL BOATS REPORTED AS THE STORM MOVED OVER THE DELAWARE RIVER. (PHI) |
| 20 UNK | 5 NE SUNSHINE | RUTHERFORD | NC | 35.51 | -81.76 | 2 TREES WERE DOWNED BY THE STORM IN THE GOLDEN VALLEY AREA OF NORTHEAST RUTHERFORD COUNTY. (GSP) |
| 21 UNK | LUMBERTON TWP | BURLINGTON | NJ | 39.96 | -74.81 | TREES DOWN. (PHI) |
| 23 UNK | 1 SSE SYOSSET MOBILE HO | NASSAU | NY | 40.79 | -73.5 | TREE REPORTED DOWN ON EXIT 38 SOUTH RAMP OF NORTHERN STATE PARKWAY. (OKX) |
| 26 UNK | STITTVILLE | ONEIDA | NY | 43.22 | -75.28 | TREES AND WIRES DOWN (BGM) |
| 27 UNK | 2 E GLENDOWER | ALBEMARLE | VA | 37.84 | -78.5 | TREE DOWN AT 200 BLOCK OF COLES ROLLING RD (LWX) |
| 27 UNK | 3 N SCOTTSVILLE | ALBEMARLE | VA | 37.84 | -78.5 | TREE DOWN AT 7334 BLENHEIM RD (LWX) |
| 28 UNK | 1 NNE LEXINGTON CITY | ROCKBRIDGE | VA | 37.8 | -79.44 | TREE DOWN ON FURRS MILL RD (RNK) |
| 29 UNK | 2 S STANARDSVILLE | GREENE | VA | 38.28 | -78.44 | TREE DOWN GREEN MOUNTAIN LAKE AREA. (LWX) |
| 29 UNK | 2 SW WOODRIDGE | ALBEMARLE | VA | 37.87 | -78.46 | TREE DOWN AT 6000 BLOCK OF JEFFERSON MILL RD (LWX) |
| 30 UNK | HOLLAND PATENT | ONEIDA | NY | 43.24 | -75.26 | 911 CENTER REPORTS MULTIPLE TREES DOWN FROM NEAR FLOYD TO TRENTON FALLS (BGM) |
| 30 UNK | 2 WNW SCOTTSVILLE | ALBEMARLE | VA | 37.81 | -78.53 | TREE DOWN AT 800 BLOCK OF IRISH RD (LWX) |
| 30 UNK | 3 SW WOODRIDGE | ALBEMARLE | VA | 37.86 | -78.46 | TREES DOWN ON JEFFERSON MILL ROAD. (LWX) |
| 33 UNK | WOODRIDGE | ALBEMARLE | VA | 37.9 | -78.44 | TREE DOWN AT ROLLING RD AND MARTINS KING RD (LWX) |
| 36 UNK | 3 E WESTMORELAND | ALBEMARLE | VA | 38.09 | -78.41 | TREES DOWN ON PROFFIT ROAD. (LWX) |
| 36 UNK | SHADWELL | ALBEMARLE | VA | 38.01 | -78.4 | TREE DOWN AT NORTH MILTON RD AND RANDOLPH MILL RD (LWX) |
| 37 UNK | 1 NNE STANARDSVILLE | GREENE | VA | 38.31 | -78.43 | MULTIPLE TREES DOWN NEAR INTERSECTION OF MADISON ROAD AND SOUTH RIVER ROAD. (LWX) |
| 39 UNK | BARBOURSVILLE | ORANGE | VA | 38.17 | -78.28 | TREES AND WIRES DOWN (LWX) |
| 40 UNK | GROTON | TOMPKINS | NY | 42.59 | -76.37 | NUMEROUS TREES DOWN IN VILLAGE (BGM) |
| 41 UNK | 2 NE EHEART | ORANGE | VA | 38.22 | -78.3 | NUMEROUS TREES DOWN ALONG 3600-5200 BLKS OF RIDGE RD (LWX) |
| 45 UNK | 2 E GLENDOWER | ALBEMARLE | VA | 37.84 | -78.5 | NUMEROUS TREES DOWN ONTO VEHICLE EASTBOUND I-64 AT MILE MARKER 131, NO INJURIES. (LWX) |
| 50 UNK | BOSWELLS TAVERN | LOUISA | VA | 38.07 | -78.19 | TREES DOWN ACROSS SW PORTIONS OF THE COUNTY. (AKQ) |
| 50 UNK | LAKE MONTICELLO | FLUVANNA | VA | 37.92 | -78.34 | TREES DOWN ACROSS SEVERAL ROADS ACROSS THE COUNTY. (AKQ) |
| 50 UNK | POLAND | HERKIMER | NY | 43.23 | -75.06 | TREES DOWN (ALY) |
| 50 UNK | 1 WNW CORTLAND | CORTLAND | NY | 42.61 | -76.2 | NUMEROUS TREES DOWN ALONG ST. RT. 281. MULTIPLE TREES DOWN IN THE CITY. (BGM) |
| 55 UNK | NEWPORT | HERKIMER | NY | 43.19 | -75.02 | TREES DOWN (ALY) |
| 100 UNK | 2 WSW MCGRAW | CORTLAND | NY | 42.58 | -76.13 | NUMEROUS TREES DOWN AROUND TOWN OF POLKVILLE. (BGM) |
| 100 UNK | 3 N GREENSBURG | ST. HELENA | LA | 30.87 | -90.67 | A FEW TREES WERE BLOWN DOWN NORTH OF GREENSBURG AND IN THE COMMUNITY OF GREENSBURG. (LIX) |
| 100 UNK | 7 W RINGGOLD | BIENVILLE | LA | 32.32 | -93.4 | TREES DOWN ON HWY 154 NEAR INTERSECTION OF BISTINEAU LAKE RD. (SHV) |
| 113 UNK | 3 WSW BURR HILL | ORANGE | VA | 38.33 | -77.9 | TREE DOWN BLOCKING RD IN 5200 BLK MUSTERFIELD RD (LWX) |
| 122 UNK | 2 S RACCOON FORD | ORANGE | VA | 38.34 | -77.95 | TREE DOWN ACROSS TRUE BLUE RD NEAR OAK GREEN RD (LWX) |
| 140 UNK | 1 N CHANCELLORSVILLE | SPOTSYLVANIA | VA | 38.31 | -77.83 | TREE DOWN ON RIVER RD (LWX) |
| 148 UNK | 4 S SNELL | SPOTSYLVANIA | VA | 38.09 | -77.59 | TREE DOWN BLOCKING 5000 BLK BLAYDES CORNER RD (LWX) |
| 217 UNK | COLUMBIA CENTER | HERKIMER | NY | 42.93 | -75.04 | TREES AND WIRES DOWN. (ALY) |

Exhibit E

# Edgewater Park resident rewards those who fought house fire

**Sean Patrick Murphy Staff Writer**

Published 12:01 a.m. ET Sept. 24, 2014 | **Updated 6:15 p.m. ET Sept. 24, 2014**





Earl Geertgens in front of his house on the 200 block of Farnum Street in Edgewater Park. He gave $500 to companies and departments that responded when his house caught fire in a lightning storm in July. He and his family are currently renting a house in Moorestown. *Burlington County Times*

*Exhibit F*

## STATEMENT OF REASONS

### Overview

This matter comes before the Court on Defendants/Third-Party Plaintiffs Earl Geertgens and Tama Geertgens (collectively, "Defendants")'s Fee Application filed pursuant to R. 4:42-9 and N.J.S.A. 56:8-19. Plaintiff/Third-Party defendants R. Malik Construction LLC and Ric Malik (collectively, "Plaintiffs") filed a Cross-Motion for Relief under R. 4:50-1. Oral arguments were held in this matter on April 16, 2019.

For the following reasons, Plaintiffs' Cross-Motion for Relief is hereby **DENIED** and Defendants' Fee Application is hereby **GRANTED**.

### Discussion

Before the Court are two post-trial motions filed by the parties. On December 13, 2018, Defendants filed a Motion for Summary Judgement. By Order and Statement of Reasons dated January 11, 2019, the Court ordered that the Defendants were entitled to a full refund of the wrongfully withheld deposit in the amount of $108,000. The Court further found that, pursuant to N.J.S.A. 56:8-2.11, the deposit was not an ascertainable loss under the Consumer Fraud Act (CFA) and Contractor's Registration Act (CRA) to be trebled, bur did hold that Defendants had successfully shown that Plaintiffs committed an unlawful act in contravention of the CFA and CRA and that Defendants were entitled to reasonable attorneys' fees, filing fees, and costs under N.J.S.A. 56:8-19. The Court permitted the case to proceed to trial on the claim of quantum meruit only.

The non-jury trial took place on January 15, 16, 17, 18, 22, 23, and 24, 2019. On March 14, 2019, following the conclusion of the trial written submissions, the Court found that Plaintiffs had failed to prove, by a preponderance of the credible evidence, that they were entitled to any award of damages in quantum meruit. The Court ordered Defendants' counsel to provide an order pursuant to the Five Day Rule.

Pursuant to this Court's January 11, 2019 Order, Defendants filed the instant Fee Application.

New Jersey courts generally adopt the American Rule and disfavor fee shifting. Litton Indus. v. IMO Indus., 200 N.J. 372, 385, 982 A.2d 420 (2009) (citation omitted); see also Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001). However, a prevailing party can recover fees if they are expressly provided for by statute, court rule, or contract. Collier, supra, 167 N.J. at 440. The case at bar deals with violations of the CFA and the CRA. The Court notes that our courts have held that an "award of treble damages and attorneys' fees is mandatory under N.J.S.A. 56:8-19 if a consumer-fraud plaintiff proves both an unlawful practice under the [CFA] and an ascertainable loss." Cox v. Sears Roebuck & Co., 138 N.J. 2, 24 (1994). If, however, a plaintiff cannot establish ascertainable loss, they cannot recover treble damages but may recover "reasonable attorneys' fees, filing fees, and costs if that plaintiff can prove that the defendant committed an unlawful practice." Ibid. Thus, it is clear that the applicable statutes provide for the recovery of attorney's fees.

*Exhibit G*

# "NOTICE TO CONSUMER

YOU MAY CANCEL THIS CONTRACT AT ANY TIME BEFORE MIDNIGHT OF THE THIRD BUSINESS DAY AFTER RECEIVING A COPY OF THIS CONTRACT. IF YOU WISH TO CANCEL THIS CONTRACT, YOU MUST EITHER:

1. SEND A SIGNED AND DATED WRITTEN NOTICE OF CANCELLATION BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED; OR

2. PERSONALLY DELIVER A SIGNED AND DATED WRITTEN NOTICE OF CANCELLATION TO:

(Name of Contractor)
(Address of Contractor)
(Phone Number of Contractor)

If you cancel this contract within the three-day period, you are entitled to a full refund of your money. Refunds must be made within 30 days of the contractor's receipt of the cancellation notice.

N.J.S.A. 56:8-151(b).

*Exhibit H*

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES
### CERTIFICATE OF DISSOLUTION AND TERMINATION

*Title N.J.S.A 42:2C*

## MOORESTOWN CONSTRUCTION LLC
### 0450070199

I, the Treasurer of the State of New Jersey, do hereby certify that the above-named business entity did on the 12th of September, 2023, file and record in this department a combined Certificate of Dissolution and Termination.

1. **Name:** MOORESTOWN CONSTRUCTION LLC
2. **Business ID#:** 0450070199
3. **Date of Formation:** 04/21/2016
4. **All assets have been discarded and have been applied to creditors or distributed to its members.**

The undersigned represents that the filing complies with State laws detailed in Title 42:2C and that they are authorized to sign this form on behalf of the Limited Liability Company.

**Filed Date:** 09/12/2023

**Signature and Title**

Ric Malik, Member



*Certificate Number : 2740948617*
*Verify this certificate online at*
*https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp*

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal, this 12th day of September, 2023*

*Elizabeth Maher Muoio*
*State Treasurer*

*Exhibit K*

Karen M. Murray (024571996)
**LAW OFFICES OF KAREN MURRAY LLC**
8 East Main Street
Moorestown, NJ 08057
(856)778-4002
(856)778-4008 fax
kmurray@murraynjlaw.com
Attorneys for Defendants/Third Party Plaintiffs

| | |
|---|---|
| EARL GEERTGENS AND TAMA GEERTGENS | SUPERIOR COURT OF NEW JERSEY BURLINGTON COUNTY LAW DIVISION |
| Defendants/Third Party Plaintiffs, | DOCKET NO. BUR-L-2561-15 JUDGMENT NO. J-94855-19 |
| v. | |
| R. MALIK CONSTRUCTION, LLC AND RIC MALIK, | CIVIL ACTION |
| Counterclaim/Third Party Defendants. | **ARREST WARRANT** |

TO: THE SHERIFF OF BURLINGTON COUNTY

You are hereby commanded to arrest, **Ric Malik, 327 Delaware Avenue, Delanco, New Jersey 08075**, or where ever he may be found, between the hours of 7:30 a.m. and 3:00 p.m. on a day when the Court is in session, and bring him forthwith before a Judge of the Superior Court to await the further Order of the Court in this matter.

Local police departments are authorized and directed to provide assistance to the officer executing this warrant.

Dated: 8/10/2023

Hon. Eric g. Fikry J.S.C
_____
Judge of the Superior Court

WITNESS:

*Michelle M. Smith*
**Michelle M. Smith, Esq.**
**Clerk of Superior Court**   Clerk





**Bank**
America's Most Convenient Bank®

STATEMENT OF ACCOUNT

MC REMODELING CORPORATION
310 MILL ST
MOORESTOWN NJ 08057–

| | |
|---|---|
| Page: | 1 of 12 |
| Statement Period: | Jul 01 2023-Jul 31 2023 |
| Cust Ref #: | 1119-717-I-*** |
| Primary Account #: | 1119 |

## TD Business Convenience Plus

MC REMODELING CORPORATION

Account #: 1119

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 138,771.99 | Average Collected Balance | 86,540.00 |
| Deposits | 12,857.00 | Interest Earned This Period | 0.00 |
| Electronic Deposits | 237.98 | Interest Paid Year-to-Date | 0.00 |
| | | Annual Percentage Yield Earned | 0.00% |
| Checks Paid | 72,665.59 | Days in Period | 31 |
| Electronic Payments | 40,073.50 | | |
| Service Charges | 5.00 | | |
| Ending Balance | 39,122.88 | | |

| | Total for this cycle | Total Year to Date |
|---|---|---|
| Grace Period OD/NSF Refund | $0.00 | $35.00 |

### DAILY ACCOUNT ACTIVITY

**Deposits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 07/18 | SBB MDEPOSIT | 12,857.00 |
| | Subtotal: | 12,857.00 |

**Electronic Deposits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 07/05 | DEBIT CARD CREDIT, AUT 070423 VISA DDA REF | 237.98 |
| | FRONTIER AI YFIG4Q   720 3744390   * CC | |
| | 4065404028408809 | |
| | Subtotal: | 237.98 |

**Checks Paid**    No. Checks: 16    *Indicates break in serial sequence or check processed electronically and listed under Electronic Payments

| DATE | SERIAL NO. | AMOUNT | DATE | SERIAL NO. | AMOUNT |
|---|---|---|---|---|---|
| 07/10 | 2085 | 500.00 | 07/06 | 3720* | 2,600.00 |
| 07/07 | 2089* | 1,000.00 | 07/11 | 3728* | 500.00 |
| 07/12 | 2094* | 4,400.00 | 07/12 | 3729 | 100.00 |
| 07/11 | 2095 | 4,350.30 | 07/12 | 3730 | 50.00 |
| 07/19 | 2096 | 50,000.00 | 07/10 | 3731 | 56.42 |
| 07/26 | 2097 | 6,000.00 | 07/10 | 3732 | 500.00 |

Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender



M-11 Page001

*Exhibit V*

## NEW JERSEY DEPARTMENT OF THE TREASURY
## DIVISION OF REVENUE

### CERTIFICATE OF INC. (PROFIT)

### MC REMODELING CORPORATION
### 0400487768

The above-named DOMESTIC PROFIT CORPORATION was duly filed in accordance with New Jersey State Law on 04/22/2012 and was assigned identification number 0400487768.  Following are the articles that constitute its original certificate.

1. **Name:**
   MC REMODELING CORPORATION

2. **Registered Agent:**
   ANDREW MALIK

3. **Registered Office:**
   30 FOX GLOVE DRIVE
   DELRAN, NJ 08075

4. **Business Purpose:**
   remodeling

5. **Stock:**
   100

6. **First Board of Directors:**
   ANDREW MALIK
   30 FOX GLOVE DRIVE
   DELRAN, NJ 08075

7. **Incorporators:**
   ANDREW MALIK
   30 FOX GLOVE DRIVE
   DELRAN, NJ 08075

   **Signatures:**
   ANDREW MALIK



FILED
APR 22 2012
STATE TREASURER



DP

Continued on next page ...